**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| **GLINDA M. MYERS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CAUSE NO. 1:06-CV-00081** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Plaintiff Glinda Myers appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying Myers's application under the

Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits

("DIB").[1] (*See* Docket # 1.)  For the reasons set forth herein, the Commissioner's decision will

be AFFIRMED IN PART and REVERSED IN PART, and the case will be REMANDED to the

Commissioner for further proceedings in accordance with this opinion.

**I.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND**[2]

*A.  Procedural History*

Myers was last insured for DIB on December 31, 1998 (referred to herein as the "DLI"),

which is significant to this appeal. (Tr. 158.)  She applied for DIB on January 21, 2003, more

than five years after her DIB insured status had expired, alleging that she became disabled as of

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] The administrative record in this case is voluminous (678 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

January 1, 1997. (Tr. 155-57.)  The Commissioner denied her application initially and upon reconsideration, and Myers requested an administrative hearing. (Tr. 103-04, 112.)  On October 27, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Myers, who was represented by counsel, her husband, and a vocational expert testified. (Tr. 51-102.)  On June 16, 2005, the ALJ rendered an unfavorable decision to Myers, concluding that she was not disabled despite the limitations caused by her impairments because she could perform light work, including her past work as an account office manager, art department manager, technical writer, and janitor/housekeeper, as well as a significant number of other jobs in the economy. (Tr. 29.)  The Appeals Council denied Myers's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 9-11.)

Accordingly, Myers filed a complaint with this Court on March 16, 2006, seeking relief from the Commissioner's final decision. (Docket # 1.)

### B.  Myers's Background and Daily Activities

At the time of her DLI, Myers was forty-nine years old, had a high school education, and possessed work experience as a sales clerk, technical writer, art department manager, parts manager, office/accounts manager, and janitor/housekeeper. (Tr. 56-57, 152, 233.)  Myers alleged in her DIB application that she became disabled as of January 1, 1997, due to lower back pain with radiculopathy; fibromyalgia; and diffuse sternum, chest wall, and rib cage pain. (Tr. 163.)

At the hearing, Myers testified that prior to her DLI she "recline[d] at least 12 hours in the day" due to her pain and fatigue, explaining that "there was always someone with [her],"

2

even when her husband went to work.[3] (Tr. 66-67, 88.)  Myers stated that when she performed

self care activities, she needed someone in the room with her "in case [she] fell because of

dizziness." (Tr. 62.)  She further explained that she performed "some" housework, such as

dusting, warming a meal, and loading the dishwasher, but that she performed no cooking or

vacuuming. (Tr. 63.)  As to leisure pursuits, Myers reported that she performed sketching, hand

sewing, and e-mailing, but that she needed to recline while performing these activities and take

rest breaks every fifteen minutes. (Tr. 63-64, 78.)  Socially, Myers reported that she attended

church "once a month if [she] felt like it" and various family events "if possible," further

confiding that she occasionally traveled to visit her son who lives three hours away, though she

needed to recline in the car during the trip.[4] (Tr. 65-66.)

        As to her physical status prior to her DLI, Myers explained that, as discussed *supra*, she

reclined twelve hours per day, shifting her position every five to six minutes. (Tr. 66-67, 83.)

She elaborated that she could sit for thirty minutes "with pain," which she rated as an "eight" on

a scale of zero to ten with "zero" being no pain and "ten" meaning extreme pain. (Tr. 67-68.)

She also asserted that she could not climb due to balance problems, but that she could stoop,

though it caused her pain at a level "seven"; she further stated that she was unable to push or pull

objects or lift and carry any items.[5] (Tr. 68, 72.)  Myers further explained that she had problems

_____

[3] Myers further reported that as of the date of the hearing she reclines sixteen hours a day. (Tr. 88.)

[4] Myers's husband testified at the hearing and essentially reiterated Myers's own testimony concerning her daily activities prior to her DLI. (Tr. 89-90.)

[5] Myers also testified that as of the date of the hearing she could lift and carry "nothing"; however, upon further examination by the ALJ, Myers admitted that she was able to lift the eighteen-ounce drink that she brought with her to the hearing. (Tr. 68-69.)  Myers then conceded that she could likely lift up to three pounds intermittently prior to her DLI, though she emphasized it caused her pain to do so. (Tr. 69.)

with grasping and holding objects due to "shakiness" and hand pain, which she rated as a "seven," and that she has worn splints on her wrists at night since 1998 due to carpel tunnel syndrome. (Tr. 69, 77.)  In addition, Myers asserted that she experienced "never ending pain" at a level "nine" in her rib cage, which she explained prevented her from lying on her back at night. (Tr. 83.)  She further testified that she has had difficulty sleeping since 1997 due to her pain, contending that on average she sleeps just two hours a night.[6] (Tr. 77.)

To help relieve her pain, Myers reported that she has participated in various pain medication regimes and has tried aqua therapy. (Tr. 84.)  She stated that she wears three medicated patches on her back at night to numb it in order to lie supine. (Tr. 84.)  Myers emphasized that using pain medication of increasing dosage has not controlled her pain and that her physicians have no other recommendations to offer to her, essentially telling her she must "[g]rin and bear it." (Tr. 85.)

As to her mental status, Myers confided that since 1997 she has suffered from depression, explaining "that [she] can't do things [she] want[s] to do . . . ." (Tr. 78.)  She reported that she takes medication for her depression as prescribed by her family practitioner; though she was referred to a psychiatrist in 1997, she explained that she has never followed up because she "do[es]n't want to admit [she] ha[s] a problem." (Tr. 79-80.)  She also contended that her thought process gets "confused," explaining that "if [she's] writing a statement, [she'll] turn words around or [she'll] leave things out." (Tr. 85.)

### C.  Summary of Medical Evidence Prior to Myers's DLI

---

[6] Myers also asserted that she has had problems with her vision, explaining that she has "twitching eyes," is near-sided, has peripheral vision problems, and experiences difficulty with night vision; however, upon further inquiry, Myers admitted that, apart from her near-sidedness, she did not seek medical intervention for these complaints. (Tr. 70-71.)

On June 3, 1996, Myers visited Dr. Vance VanDrake due to experiencing pain in the left side of her chest and left arm. (Tr. 637.)  Dr. VanDrake noted that in 1981 Myers had a hiatal hernia that was repaired with a wrap and that she also had a Nissen fundoplication procedure.[7] (Tr. 637.)  He determined that Myers's x-rays showed a failed Nissen and some recurrent hernia and reflux; thus, he suggested that she undergo an endoscopy, the results of which were normal except with respect to evidence of the Nissen wrap that had partially broken down. (Tr. 636-37.) Dr. VanDrake concluded, however, that Myers could get along adequately with changes in her diet, rather than undergo a repeat surgery. (Tr. 636.)

Nonetheless, over the next two months, Dr. VanDrake observed that Myers continued to have "squeezing-like discomfort" in her chest and cervical area but that the endoscopy, motility, and x-ray had not pinpointed the cause of the pain. (Tr. 631, 633-34.)  He suspected costochondritis[8] and ultimately evaluated her pain using a twenty-three hour probe, the results of which suggested that her symptomology was not directly related to reflux. (Tr. 630-31.)  Dr. VanDrake then referred Myers to the Mayo Clinic. (Tr. 631.)

On October 22, 1996, Myers visited Dr. Michael Camilleri at the Mayo Clinic, complaining of numbness, throbbing, and aching in her left arm and episodes of central chest pain. (Tr. 627-28.)  Dr. Camilleri concluded that Myers's chest pain was partly related to tight fundoplication and thus performed a Savary dilatation of the segment. (Tr. 624, 627-28.)  One

---

[7] A fundoplication is a "[s]uture of the fundus of the stomach completely or partially around the gastroesophageal junction to treat gastroesophageal reflux disease." *Stedman's Medical Dictionary* 777 (Lippincott Williams & Wilkins, 28th ed. 2006).

[8] Costochondritis is an "[i]nflammation of one or more [rib] cartilages, characterized by local tenderness and pain of the anterior chest wall that may radiate. . . ." *Stedman's Medical Dictionary* 450 (Lippincott Williams & Wilkins, 28th ed. 2006).

month later, Myers returned to the Mayo clinic reporting no improvement; thus, Dr. Camilleri recommended that she undergo a takedown and redo of her previous fundoplication, which she did on January 30, 1997. (Tr. 237-238, 622.)  Several days after her surgery, Myers again developed chest pain, which was diagnosed as pericarditis.[9] (Tr. 243, 618-19, 643.)

On February 14, 1997, after her release from the Mayo Clinic, Myers visited Dr. Rex Flenar, her general practitioner, for post-surgical follow up care. (Tr. 390.)  Dr. Flenar diagnosed Myers with pericarditis, stable; severe reflux esophagitis;[10] and status-post Nissen fundoplication. (Tr. 390.)  He altered her medication, referred her to a cardiologist, and ordered a chest x-ray. (Tr. 390.)  Two weeks later, Myers was briefly hospitalized at Lutheran Hospital for chest pain secondary to pericarditis. (Tr. 601.)

On March 7, 1997, Myers visited Dr. Mark Hazen, a cardiologist, reporting chest pain that felt like a "heavy weight all the time" and worsened with activity. (Tr. 598.)  Dr. Hazen ordered a Medrol Dose Pak and a Thallium test. (Tr. 598.)  One week later, Myers visited the emergency room, reporting that she had finished the steroid dose pak three days earlier, that her chest pain had worsened, and that she had run out of pain medication. (Tr. 643.)  The emergency room physician observed that Myers did not appear significantly impaired, assigned her a diagnosis of acute chest pain due to pericarditis, and adjusted her medication. (Tr. 644.)

On April 21, 1997, Myers visited Dr. Flenar for a follow up visit concerning her esophagitis, reporting to him that she was not having chest pain like she previously had with her

---

[9] Pericarditis is the inflammation of the pericardium, the membrane covering the heart. *Stedman's Medical Dictionary* 1,457 (Lippincott Williams & Wilkins, 28th ed. 2006).

[10] Reflux esophagitis is the "inflammation of the lower esophagus from regurgitation of acid gastric contents, usually due to malfunction of the lower esophageal sphincter." *Stedman's Medical Dictionary* 670-71 (Lippincott Williams & Wilkins, 28th ed. 2006).

pericarditis. (Tr. 389.)  Nonetheless, Myers returned to Dr. Flenar one month later complaining of recurring chest discomfort that felt like pericarditis pain, together with paresthesias of her left arm, left leg, and upper lateral left thigh. (Tr. 389.)

On June 12, 1997, Myers visited Dr. Mark Jones, a cardiologist, for ongoing complaints of chest discomfort. (Tr. 261-63.)  Dr. Jones explained to Myers that if she was continuing to experience pericarditis the next step would be a pericardectomy.[11] (Tr. 262-63.)  However, he was concerned that Myers's chest discomfort was not necessarily caused by pericarditis, and thus he recommended that she obtain a second opinion. (Tr. 263.)  Two weeks later, Myers visited the hospital emergency room for chest pain; an echocardiogram was ordered, the results of which were normal. (Tr. 240-41.)

On July 9, 1997, Myers visited Dr. Julie Fetters, a cardiologist, for a second opinion. (Tr. 243.)  As the results of an electrocardiogram and echocardiogram were negative, Dr. Fetters concluded that Myers's symptoms could be consistent with pericarditis but that she could not rule out the possibility of a gastrointestinal source. (Tr. 244-45.)  Dr. Fetters noted the evidence of a small pleural effusion on Myers's echocardiogram, which she suggested could be evidence of an underlying connective tissue disorder; thus, she recommended that Myers not undergo a pericardectomy. (Tr. 244-45.)

On August 4, 1997, Myers was seen by Dr. Roger Veronique at the Mayo Clinic to obtain another opinion concerning her chest pain. (Tr. 611.)  She underwent an electrogram, the results of which were normal. (Tr. 611.)  He assigned her the following diagnosis: chest pain, which

---

[11] A pericardectomy is the excision of a portion of the pericardium. *Stedman's Medical Dictionary* 1,457 (Lippincott Williams & Wilkins, 28th ed. 2006).

may not be attributable to pericarditis, and dyspnea and exertion, most likely due to
deconditioning. (Tr. 611.)  He did not believe that a pericardectomy was indicated due to the
lack of evidence of ongoing pericardial disease. (Tr. 611.)

While at the Mayo Clinic, Myers was also evaluated by Dr. Michael Palmen, a
psychiatrist. (Tr. 612-13.)  Myers explained to Dr. Palmen that she had previously experienced
some symptoms of depression but that they had decreased over the last year. (612-13.)  On
examination, Dr. Palmen noted that Myers's mood was mildly depressed and that her affect was
in the constricted range; however, he found that her thought form, content, perception, cognition,
memory, attention, concentration, abstraction, judgment, and insight were all within normal
limits. (Tr. 612-13.)  He assigned her a diagnosis of normal grief reaction and possible
dysthymic disorder precipitated by her mother's recent diagnosis with terminal cancer. (Tr. 613.)
He suggested that she try an anti-depressant medication, that she and her sisters participate in
counseling, and that she consult a local psychiatrist. (Tr. 613.)

Myers was next evaluated by Dr. Alan Cameron at the Mayo Clinic for her chest pain
and dyspnea. (Tr. 609.)  On physical examination, Dr. Cameron noted that Myers was
overweight and slightly depressed; he diagnosed her with probable chest wall pain, noting that
the tomograms of her sternum showed some degenerative changes at the manubria sternal joint.
(Tr. 607, 609.)  He recommended to Dr. Jones that Myers be referred to a local pain clinic and  a
psychiatrist. (Tr. 607.)

On October 22, 1997, Myers returned to Dr. Flenar, who noted that the Mayo Clinic
had suggested that Myers receive injections for pain and that she had underlying depression. (Tr.
385.)  Upon examination, Dr. Flenar noted that Myers seemed depressed concerning her

mother's illness and recent death, and thus he prescribed Paxil. (Tr. 385.)  Two weeks later,

however, Myers returned to Dr. Flenar for a recheck of her depression and chest pain, reporting

that overall her mood was fair. (Tr. 384.)  On physical examination, Dr. Flenar noted that Myers

had a painful trigger point and thus administered an injection to the area, which gave her some

relief. (Tr. 384.)  Since Myers's mood had improved and since she complained the anti-

depressant was making her nauseous, Dr. Flenar took her off the Paxil. (Tr. 384.)  One month

later, Myers returned for a follow up visit with Dr. Flenar, reporting that her chest pain had

completely resolved; she further reported that she was still having some mild depression, though

she thought she was "slowly getting over [it]" and did not want to take medication for it. (Tr.

383.)

     Nonetheless, on January 7, 1998, Myers returned to Dr. Flenar, again complaining of

recurrent chest pain in the same area. (Tr. 383.)  He then injected the area of point tenderness,

which relieved Myers's pain. (Tr. 383.)  Six weeks later, Myers reported to Dr. Flenar that her

chest wall pain had largely dissipated, explaining that she noted it only when lifting items;

however, she complained of a headache and depressed mood. (Tr. 382.)  Upon clinical

examination, Dr. Flenar determined that she was suffering from a prolonged grief reaction and

thus recommended she go back on the Paxil. (Tr. 382.)  Myers did not return to Dr. Flenar until

seven months later, complaining of nausea, chest pain, and a feeling like she had a lump in her

left lower chest below her rib cage. (Tr. 382.)

     On October 6, 1998, Myers consulted Dr. Jones, the cardiologist, complaining of chest

discomfort that she noticed particularly when bending over and working in her garden. (Tr. 276.)

Dr. Jones diagnosed her with chest wall pain and probable esophageal pain but told Dr. Flenar

that he had no plans to do further testing. (Tr. 276.)  Dr. Flenar then referred Myers to Dr.

Warren Hauck, a gastroenterologist, for evaluation of her epigastric pain and minimal dysphagia.

(Tr. 350.)  Dr. Hauck reviewed Myers's lengthy medical history and ultimately opined that no

further diagnostic testing would likely benefit her. (Tr. 350.)  He recommended that she take

Prilosec for her gastrointestinal symptoms, instructed her to eat small frequent meals, and

cautioned her to avoid greasy foods and large amounts of dairy products. (Tr. 352.)

On December 7, 1998, Myers visited Dr. Flenar, reporting that her stomach discomfort

had decreased since starting on Prilosec and that she was "able to rest and do activities of daily

living without much distress" since starting on Paxil. (Tr. 379.)

### D.  Summary of Medical Evidence After Myers's DLI

On April 16, 1999, Myers returned to Dr. Flenar for a reoccurrence of her pain. (Tr. 379.)

She reported that after her last steroid injection, she had been much better for months; thus, she

requested that Dr. Flenar administer another steroid injection. (Tr. 379.)  Two months later,

Myers returned to Dr. Flenar, reporting that her rib pain was doing well. (Tr. 375, 378.)

On December 13, 1999, Myers consulted Dr. Thomas L. Lazoff, a physical medicine and

rehabilitation specialist, for her complaints of sternal pain. (Tr. 638-40.)  He prescribed

Neurontin to reduce her neuropathic pain, advised against further steroid injections, and

recommended that she participate in a pain management program led by Dr. Frances Goff, a

clinical neuropsychologist, to teach her some coping skills. (Tr. 640.)

On December 13, 1999, Myers was evaluated by Dr. Goff for pain management. (Tr.

588.)  On mental status examination, Dr. Goff observed that Myers's affect was initially flat but

that she was able to later smile and show animation. (Tr. 589.)  Myers's score on the Beck

Depression Inventory Scale-II indicated that she had no or only very minimal depression; her results on the Pain Patient Profile suggested below average depression when compared to other pain patients; and her score on the somatization scale reflected an absence of emotional threat and concentrated thought about pain and physical problems. (Tr. 589.)  Dr. Goff noted that Myers's somatization scale results were somewhat in conflict with her monologue about her physical problems and complaints, which suggested to him that Myers may be under-reporting her symptoms; however, he observed that the Oswestry Activity Rating scale indicated that Myers was able to function normally in her everyday life. (Tr. 589.)  He recommended that Myers attend three additional sessions with him. (Tr. 590.)

On January 10, 2000, Myers returned to Dr. Lazoff, reporting that the Neurontin had made her feel "off balance" and thus she had discontinued its use. (Tr. 591.)  Dr. Lazoff discussed the possibility of injections with Myers, but she did not want to pursue them, reporting that overall "she is doing somewhat better given some of the relaxation techniques and a decrease in her painting activities." (Tr. 591.)  Not long thereafter, Dr. Goff reported to Dr. Lazoff that Myers had not attended any of his recommended therapy sessions, and thus he discharged her from his care. (Tr. 587.)

Between March 2000 and July 2001, Myers visited Dr. Flenar eleven times for various complaints including dizziness, nausea, persistent fatigue, headaches, lower back pain, chest pain, and abdominal pain. (Tr. 369-74.)  He administered injections, altered her medications, and ultimately referred her to Dr. Steven Behrendsen, a rheumatologist. (Tr. 370.)

On August 3, 2001, Myers was evaluated by Dr. Behrendsen. (Tr. 273-75.)  Dr. Behrendsen noted that Myers's MRI of the low back revealed only mild degenerative

11

changes, which were not enough to explain her complaint of severe low back pain. (Tr. 273-75.)

On physical examination, Dr. Behrendsen observed that Myers appeared fatigued and that she

had eleven out of a possible eighteen myofascial tender points, which was consistent with

fibromyalgia syndrome. (Tr. 273-75.)  He recommended that Myers undergo further testing, a

physical therapy program, and an intercostal nerve ablation,[12] which he believed would relieve

her left chest wall neuropathic pain. (Tr. 275.)

On July 22, 2002, Myers underwent evaluation at the Cleveland Clinic, complaining that

she could not control her pain through medication and that her chronic fatigue had worsened in

the last six months, causing her to recline eighteen hours of the day. (Tr. 327-29.)  On the Pain

Disability Index, Myers's score suggested marked functional impairment. (Tr. 327-29.)

Emotionally, Myers reported feelings of frustration but denied feelings of sadness, anxiety, or

irritability; her score on the Beck Depression Inventory was normal. (Tr. 327-29.)  Cleveland

Clinic assigned a diagnosis of post-thoracotomy neuropathic pain, fibromyalgia, and probable

mechanical low back pain. (Tr. 329.)

On February 19, 2003, Dr. Flenar provided a letter in support of Myers's request for DIB,

explaining Myers's lengthy medical history and that she was unable to control her pain. (Tr.

357.)  Dr. Flenar asserted that Myers was "unable to lift, push, pull, i.e., do anything with her

arms repeatedly without acute exacerbation of the pain" and that she "has been disabled and

unable to work since January of 1997." (Tr. 357.)

On May 30, 2003, Myers was examined by Candace Martin, Ph.D., a clinical

---

[12] An intercostal nerve ablation means the removal of the nerves between the ribs. *Stedman's Medical Dictionary* 3, 986 (Lippincott Williams & Wilkins, 28th ed. 2006).

psychologist. (Tr. 396-99.)  Dr. Martin noted that Myers's mood was rather depressed, that her affect was discouraged, and that her memory skills were less than expected given her suggested intelligence. (Tr. 399.)  Dr. Martin concluded that Myers's ability to function independently was limited by situational depression, which was likely caused by her multiple physical problems. (Tr. 399.)  Dr. Martin concluded that Myers was not likely to be fully capable of gainful employment in highly competitive and advanced job positions as she had done in the past. (Tr. 399.)  Dr. Martin diagnosed Myers with a dysthymic disorder,[13] an adjustment disorder with depressed mood, and an amnestic disorder, assigning her a GAF score of fifty-eight.[14] (Tr. 399.)

On July 17, 2003, J. Gange, Ph.D, a state agency psychologist completed a psychiatric review technique and mental residual functional capacity assessment of Myers's "current" condition. (Tr. 400-17.)  Dr. Gange concluded that as a result of her depression Myers experienced a mild limitation in her activities of daily living, a moderate limitation in maintaining social functioning, and a moderate limitation in maintaining concentration, persistence, or pace. (Tr. 414.)  Dr. Gange's opinion was affirmed by W. Shipley, Ph.D., another state agency psychologist, on October 8, 2003. (Tr. 402.)

On May 20, 2004, Myers returned to Dr. Behrendsen, who noted that over the last three years there had been a number of developments that served to significantly clarify her clinical situation. (Tr. 575.)  He considered the most important development to be that Myers's

---

[13] Dysthymia is a chronic mood disorder manifested as depression for most of the day, more days than not. *Stedman's Medical Dictionary* 602 (Lippincott Williams & Wilkins, 28th ed. 2006).

[14] Global Assessment of Functioning (GAF) is a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning on a hypothetical continuum of mental health illness; the GAF excludes any physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  A GAF score of fifty-eight means an individual experiences moderate symptoms or has moderate difficulty in social, occupational, or school functioning. *Id.*

pericarditis responded to Prednisone and tapering, which suggested to him a diagnosis of systemic lupus erythematosus ("SLE").[15] (Tr. 575.)

In a letter to Myers's attorney dated September 30, 2004, Dr. Behrendsen opined that though he could not specifically identify a date of onset, it was likely that Myers had SLE "for a number of years, perhaps even for many years prior to 1998." (Tr. 418.)  He clarified, however, that he "ha[s] no proof of that," explaining that his opinion was "based on the fact that she does *now* clearly satisfy criteria for the diagnosis in that she has a positive ANA, history of pericarditis, polyarthritis, photosensitivity, malar rash, and nasal and oral mucosal ulcers and lymphopenia" and that her symptoms were responsive to steroids. (Tr. 418 (emphasis added).)

On October 25, 2004, Dr. Flenar completed a medical source statement with respect to Myers's status as of her DLI. (Tr. 653-56.)  Dr. Flenar responded "do not know" to questions concerning whether Myers was capable of working an eight-hour workday, whether she would need to take unscheduled breaks, and whether she would miss work as a result of her impairment. (Tr. 653-56.)

### E.  The ALJ's Decision

On June 16, 2005, the ALJ rendered his opinion. (Tr. 18-31.)  He found at step one of the five-step analysis that Myers had not engaged in substantial gainful activity since her alleged onset date and at step two that she had a "severe" impairment with respect to her costochondritis. (Tr. 30.)  However, at step three, he determined that Myers's costochondritis was not severe

---

[15] SLE is "a chronic, multisystem, inflammatory disorder of probably autoimmune etiology, occurring predominantly in young women.  Common manifestations include arthralgias and arthritis; malar and other skin rashes; pleuritis or pericarditis; renal or CNS involvement; and hematologic cytopenia." *The Merck Manual* 266 (Mark H. Beers, ed., 18th ed. 2006).

enough to meet a listing. (Tr. 30.)  Before proceeding to step four, the ALJ determined that

Myers's testimony concerning her limitations was not credible and that she had the residual

functional capacity ("RFC") as of her DLI to perform light work. (Tr. 30.)

Based on this RFC, the ALJ concluded at step four that as of her DLI Myers could

perform her past work as an account manager, parts manager, art department manger, and

technical writer. (Tr. 29, 30.)  In addition, the ALJ proceeded to step five where he determined

that, considering her age, education, and experience, Myers could also perform a significant

number of jobs in the economy as of her DLI, including unskilled light work as a mail sorter,

office helper, information clerk, and cashier; and unskilled sedentary work as a tape print layout

person, surveillance systems monitor, order clerk, document preparer, and file touch up

inspector. (Tr. 30.)  Therefore, Myers's claim for DIB was denied. (Tr. 30.)

## II.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The

ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227

F.3d 863, 869 (7th Cir. 2000).  Substantial evidence means "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted).  The

decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied

an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record but does not

reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment

for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## III.  THE LAW

To be considered disabled under the Act, a claimant must establish that she is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  The impairment must be severe, causing the claimant to be unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[16] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it

---

[16] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## IV.  ANALYSIS

Myers claims that the ALJ erred by: (1) failing to evaluate the opinion of the state agency psychologists who reviewed her medical record in 2003; (2) failing to consider a letter from Dr. Flenar in 2003 expressing his retrospective opinion concerning her limitations; (3) improperly determining that her testimony of debilitating limitations was "not totally credible"; and (4) improperly considering a letter from Dr. Behrendsen in 2004 expressing his retrospective opinion concerning her diagnosis. (Opening Br. of Pl. in Social Security Appeal ("Opening Br.") at 21-25.)  Ultimately, two of the four arrows launched by Myers hits the mark.

### A.  *The ALJ Erred by Failing to Discuss the Opinion*
### *of the Reviewing State Agency Psychologists*

First, Myers asserts that the ALJ erred by failing to consider the opinion of Dr. Gange, the state agency psychologist who reviewed her medical record and assessed her mental residual functional capacity as of July 2003.[17]  Myers contends that the ALJ's oversight is significant because the ALJ determined at step two of his analysis that she did not have a "severe" mental impairment, yet Dr. Gange concluded in 2003 that she experienced a moderate limitation in maintaining social functioning and a moderate limitation in maintaining concentration, persistence, or pace.[18]

Social Security Ruling 96-2p states that an ALJ must consider the opinions of state agency consultants "as expert opinion evidence of nonexamining physicians and psychologists

---

[17] Dr. Gange's opinion was later affirmed by Dr. Shipley, another state agency psychologist.

[18] At step two, "[a]n impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which would have no more than a *minimal* effect on the individual's physical or mental ability(ies) to perform basic work activities." SSR 86-8 (emphasis added).

and must address the opinions in their decisions." *See also Gotz v. Barnhart*, 207 F. Supp. 2d

886, 900 (E.D. Wis. 2002).  To elaborate, an ALJ "must evaluate opinion evidence from medical

or psychological consultants using all of the applicable rules in 20 CFR 404.1527 . . . to

determine the weight to be given to the opinion."[19] SSR 96-5p; *see also* 20 C.F.R. § 404.1527

(emphasizing that the Commissioner must "evaluate every medical opinion [it] receive[s]"); SSR

96-6p (articulating that ALJ's "are not bound by findings made by State agency or other program

physicians and psychologists, but they may not ignore these opinions and must explain the

weight given to the opinions in their decisions").

Here, the ALJ did indeed fail to evaluate the opinion in accordance with 20 C.F.R. §

404.1527 and thus erred. *See Mayfield v. Barnhart*, No. 01 C 9418, 2003 WL 223310, at *9

(N.D. Ill. Jan. 30, 2003) (remanding decision due to ALJ's failure to consider the opinions of the

state agency physicians); *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999) (articulating that

social security rulings are binding on all components of the Social Security Administration).

The Commissioner, however, disagrees, asserting that the ALJ did not err in doing so because

"the state agency doctors made clear that the report was an assessment of [Myers's] <u>current</u>

condition in 2003," rather than her condition prior to her DLI. (Def.'s Mem. in Supp. of the

Commissioner's Decision at 16.)

"The first problem with this argument is that the ALJ did not make it." *Blom v. Barnhart*,

363 F. Supp. 2d 1041, 1059 (E.D. Wis. 2005).  "[P]rinciples of administrative law require the

---

[19] 20 C.F.R. § 404.1527(d) states that each medical source opinion, other than a treating physician's opinion entitled to controlling weight, must be evaluated pursuant to the following factors to determine the proper weight to apply to it: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner.

ALJ to rationally articulate the grounds for her decision and confine [judicial] review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002).  Perhaps the ALJ did reject the reports of the state agency psychologists for this reason, but this is mere speculation since he failed to articulate as much in his decision. *Blom*, 363 F. Supp. 2d at 1059; *see also Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir. 1984) (clarifying that unless the ALJ explains his reasoning the reviewing court cannot tell if he rejected the evidence or simply ignored it).

Moreover, the Seventh Circuit Court of Appeals has clearly stated that evidence of a claimant's condition during the post-insured period is relevant to her claim. *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th Cir. 1991).  The opinions of the state agency psychologists, as well as the opinion of Dr. Martin, may be particularly relevant in this case since it is the only medical evidence that suggests Myers may have experienced more than a minimal limitation as a result of her mental status. *See generally Shroeter v. Shalala*, No. 90 C 3756, 1994 WL 559122, at *5 (N.D. Ill. Oct. 7, 1994) (emphasizing that "an ALJ must weigh all the evidence and not ignore a physician's opinion or report which suggests an opposite conclusion").

Thus, we cannot definitively conclude at this juncture that the ALJ's failure to discuss this post-DLI evidence of record constitutes harmless error. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).  Therefore, the case will be remanded so that the ALJ can properly evaluate in accordance with 20 C.F.R. § 404.1527 *all* of the post-DLI medical evidence of record concerning Myers's mental status, including the opinions of the state agency psychologists, Dr. Martin, Dr. Goff, and the Cleveland Clinic.

#### B.  The ALJ Erred by Failing to Discuss the 2003 Letter from Dr. Flenar

Myers next contends that the ALJ erred by failing to evaluate Dr. Flenar's 2003 letter, which stated that she "is unable to lift, push, pull, i.e., do anything with her arms repeatedly without acute exacerbation of the pain" and that she "has been disabled and unable to work since January of 1997."[20] (Tr. 357.)  As with Myers's first argument, this omission by the ALJ must be remedied upon remand.

Whether a claimant applying for DIB is "disabled" or "unable to work" is an administrative finding that is reserved to the Commissioner. 20 C.F.R. § 404.1527(e); SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.").  Notwithstanding the foregoing, a medical source opinion on these issues "must not be disregarded." SSR 96-5p; *see also* 20 C.F.R. § 404.1545 ("We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations."); SSR 96-6p.

Though the ALJ did discuss various treatment records from Dr. Flenar, he failed to discuss Dr. Flenar's 2003 letter concerning Myers's alleged upper extremity limitations and her purported inability to work in 1997.  In doing so, the ALJ did not comply with the requirements of Social Security Ruling 96-5p and therefore erred. *See Lauer*, 169 F.3d at 492; *see generally Anderson*, 925 F.2d at 222.  The Commissioner, however, contends that the ALJ's error was harmless because: (1) Dr. Flenar's opinion goes to the ultimate issue of disability, which is an issue reserved to the Commissioner; (2) Dr. Flenar's 2004 medical source statement, in which he

---

[20]   The Commissioner contends that Myers waived this argument by asserting it in a cursory manner in her opening brief; the Court, however, finds the Commissioner's argument unpersuasive.

responded "do not know" to questions concerning Myers's ability to work an eight-hour

workday as of her DLI, is inconsistent with his 2003 letter; and (3) Dr. Flenar's

contemporaneous treatment records as of Myers's DLI do not support the conclusory opinions

articulated in his 2003 letter. (Def.'s Mem. in Supp. of the Commissioner's Decision at 17.)

The Commissioner's first argument, of course, is a loser, as Social Security Ruling 96-5p

clearly states that medical source statements concerning what a claimant can do despite her

impairments must never be ignored.  The problem with the Commissioner's remaining

arguments "is that the ALJ did not make [them]." *Blom*, 363 F. Supp. 2d at 1059.  As articulated

*supra*, "principles of administrative law require the ALJ to rationally articulate the grounds for

her decision and confine [judicial] review to the reasons supplied by the ALJ." *Steele,* 290 F.3d

at 941.  Perhaps the ALJ did reject Dr. Flenar's 2003 letter because it was inconsistent with his

contemporaneous treatment records and 2004 medical source statement, but this is mere

speculation since he failed articulate as much in his decision. *Blom*, 363 F. Supp. 2d at 1059; *see

also Zblewski*, 732 F.2d at 79.  Moreover, it is not this Court's function to resolve conflicts in the

record or decide questions of credibility. *Young v. Barnhart*, 362 F.3rd 995, 1001 (7th Cir.

2004).         Furthermore, as discussed *supra* with respect to the opinion of the state agency

psychologists, evidence of a claimant's condition during the post-insured period is relevant to

her claim. *Anderson*, 925 F.2d at 222.  Since Dr. Flenar's 2003 letter assigned Myers a physical

limitation concerning the use of her arms that was inconsistent with the RFC ultimately assigned

by the ALJ, Dr. Flenar's opinion may be particularly relevant in this instance and thus should

have been discussed by the ALJ. *See generally Samuel v. Barnhart*, 316 F. Supp. 2d 768, 774

(E.D. Wis. 2004) (remanding case because, though the ALJ discussed some treatment records

from claimant's treating physician, the ALJ failed to discuss or accommodate the limitations assigned to claimant by such physician in a separate report).

As a result, we cannot conclude that the ALJ's failure to discuss this post-DLI evidence of record constitutes harmless error. *See Shramek*, 226 F.3d at 814.  Therefore, the case will be remanded so that the ALJ can properly evaluate Dr. Flenar's 2003 letter and his 2004 medical source statement in accordance with 20 C.F.R. § 404.1527.

### C.  The ALJ's Credibility Determination Will Not Be Overturned

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray*, 843 F.2d at 1002; *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek*, 226 F.3d at 811, his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, the ALJ determined that Myers's testimony was not credible, stating that "it is greatly exaggerated and not supported by nor consistent with the medical evidence of record." (Tr. 28.)  The ALJ then explained that Myers's testimony stating that she reclined twelve hours per day and needed assistance with bathing and dressing prior to her DLI was inconsistent with the medical evidence of record reflecting that she was performing her daily activities "without much distress," working in her garden, and exercising prior to her DLI. (Tr. 28.)  Myers,

however, contends that the ALJ erred by improperly "equat[ing] daily living activities with work." (Opening Br. at 22.)

Contrary to Myers's assertion, the ALJ did no such thing; rather, the ALJ simply noted the inconsistency between Myers's testimony concerning her daily activities prior to her DLI, that is, that she had to recline twelve hours per day, and the contemporaneous information concerning her daily activities in the medical record.  For example, the ALJ identified that the record indicates that Myers worked as an artist until July 1999 and that she continued to perform small projects thereafter as an interior design consultant (Tr. 328); that she was "bending over and working in the garden" prior to her DLI (Tr. 276); that she experienced mild sternal discomfort "particularly after exercise" prior to her DLI (Tr. 351); and that as of December 1998 she was "able to rest and do activities of daily living without much distress" (Tr. 379).[21]  The ALJ was entitled to recognize these inconsistencies between the medical evidence of record and Myers's testimony concerning her daily activities, and thus he committed no error. *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995); SSR 96-7p.

In addition, the ALJ determined that the medical treatment records prior to Myers's DLI do not reflect the level of functional deterioration that Myers portrayed in her testimony for such time period. (Tr. 28.)  For example, as to Myers's physical status, the ALJ pointed out that the medical evidence indicates she received injections for her chest wall pain from Dr. Flenar during

---

[21] The ALJ also noted that even after her DLI the record suggests that Myers participated in more activities than what she testified to. (Tr. 27.)  For example, on October 18, 1999, Myers consulted Dr. Flenar for a recurrence of her costochondral pain, explaining to Dr. Flenar that her pain was likely aggravated by her "doing a lot of painting" as she and her husband were building a new house. (Tr. 374.)  Similarly, Dr. Flenar's note dated July 17, 2000, indicates that Myers's chest pain might have been triggered by her "unload[ing] a load of bricks last weekend." (Tr. 373.)  Likewise, Dr. Flenar's noted dated September 14, 2000, indicated that Myers "was pulling weeds by the barn last weekend." (Tr. 371.)

the relevant period that significantly alleviated her pain; the ALJ then noted that it was not until

2002, that is, four years *after* her DLI, that Myers first reported to a medical professional that she

needed to recline the majority of her day.

Likewise, as to Myers's mental status, the ALJ identified that Myers's depression was

controlled through medication prescribed by her general practitioner, rather than seeking the care

of a psychiatrist or counselor, noting Dr. Flenar's statement in December 1998 that Myers "is

currently taking Paxil and is able to rest and do activities of daily living without much distress."

(Tr. 379.)  The ALJ also noted that Dr. Palmen of the Mayo Clinic opined in August 1997 that

Myers's mood was "mildly depressed" but that her thought form, content, perception, cognition,

memory, attention, concentration, abstraction, judgment, and insight were all within normal

limits. (Tr. 27-28.)

In summary, the ALJ clearly built an accurate and logical bridge between the evidence of

record and his conclusion that Myers's testimony was not credible, and his determination is not

"patently wrong." *See Shramek*, 226 F.3d at 811; *Powers*, 207 F.3d at 435.  Thus, the ALJ's

credibility determination will not be overturned.

### D.  The ALJ Did Not Err When Considering the 2004 Letter from Dr. Behrendsen Concerning Myers's Lupus Diagnosis

Finally, Myers asserts that the ALJ erred when considering Dr. Behrendsen's 2004 letter

concerning whether she suffered from SLE prior to her DLI.  Upon closer examination, it is clear

that by advancing this argument Myers is simply requesting that the Court reweigh this evidence.

In reviewing the ALJ's decision, the Court may not "reweigh evidence, resolve conflicts

in the record, decide questions of credibility, or, in general, substitute our own judgment for that

of the Commissioner." *Young*, 362 F.3d at 1001.  Rather, "[o]ur task is limited to determining

whether the ALJ's factual findings are supported by substantial evidence." *Id.*

Here, the ALJ expressly acknowledged Dr. Behrendsen's letter in his opinion, explaining

that he believed it supported his determination that Myers was not disabled by SLE prior to her

DLI:

> The medical evidence of record does not support a finding that the claimant may
> have been experiencing systemic lupus on or before December 31, 1998, as there
> is no medical evidence to support such a position, *which was essentially the*
> *opinion of treating rheumatologist, Dr. Steven Behrendsen.*  Further, even if the
> claimant was experiencing systemic lupus prior to December 31, 1998, the
> medical evidence of record reflecting the claimant's conditions, and the evidence
> reflecting the claimant's activities of daily living do not support a finding that this
> condition was causing disabling functional limitations.

(Tr. 26 (emphasis added and internal citations omitted).)  Thus, "[t]he ALJ did not ignore [Dr.

Behrendsen's] evidence . . ., but rather considered it in light of all of the other evidence before

him." *Young*, 362 F.3d at 1001.  The Court will not accept Myers's invitation to substitute our

own judgment for that of the Commissioner in the hopes that it will come out in her favor this

time. *See id.*

Furthermore, the ALJ articulated that his conclusion would not change even if Myers *was*

suffering from SLE prior to her DLI. *See Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is

not enough to show that she had received a diagnosis of fibromyalgia with a date of onset prior

to the expiration of the insured period, since fibromyalgia is not always . . . disabling.");

*Anderson*, 925 F.2d at 222 (acknowledging that evidence of the claimant's condition after her

DLI is relevant, but not determinative, when contemporaneous medical evidence indicates that

the claimant was not disabled prior to her DLI).  Thus, the ALJ concluded that the evidence

concerning Myers's physical status and her daily activities during the relevant period did not

support a finding that she was "disabled" prior to her DLI, regardless of the SLE diagnosis.

Thus, Myers's final argument in support of a remand is unavailing.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED IN PART and REVERSED IN PART, and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion.  The Clerk is directed to enter a judgment in favor of Myers and against the Commissioner.

SO ORDERED.

Enter for this 7th day of February, 2007.

S/Roger B. Cosbey
Roger B. Cosbey
United States Magistrate Judge